IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TRANSFIRST GROUP, INC. f/k/a | § | |
| TRANSFIRST HOLDINGS, INC., | § | |
| TRANSFIRST THIRD PARTY SALES, | § | |
| LLC f/k/a TRANSFIRST MERCHANT | § | |
| SERVICES, INC., and PAYMENT | § | |
| RESOURCES INTERNATIONAL, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | CIVIL ACTION NO. 3:16-CV-1918-L |
| | § | |
| DOMINIC J. MAGLIARDITI; FRANCINE | § | |
| MAGLIARDITI; in her individually | § | |
| capacity, and as trustee of FRM TRUST, | § | |
| DJM IRREVOCABLE TRUST, and the | § | |
| FANE TRUST; ATM ENTERPRISES, LLC; | § | |
| DII CAPITAL, INC.; DFM HOLDINGS, | § | |
| LTD.; DFM HOLDINGS, LP; DII | § | |
| PROPERTIES LLC; and SPARTAN | § | |
| PAYMENT SOLUTIONS, LLC, | § | |
| | § | |
| Defendants. | § | |

## FIRST AMENDED COMPLAINT

Plaintiffs TransFirst Group, Inc. f/k/a TransFirst Holdings, Inc., TransFirst Merchant Third Party Sales, LLC f/k/a TransFirst Merchant Services, Inc., and Payment Resources International, LLC (collectively, "TransFirst") file this First Amended Complaint against Defendants Dominic J. Magliarditi, Francine Magliarditi, in her individual capacity and in her role as trustee of FRM Trust, DJM Irrevocable Trust, and Fane Trust (these defendant trusts are collectively referred to herein as the "Magliarditi Trusts"), and against Defendants ATM Enterprises LLC ("ATM Enterprises"), DII Capital, Inc. ("DII Capital"), DFM Holdings, Ltd. ("DFM Holdings I"), DFM Holdings, LP ("DFM Holdings II"), DII Properties, LLC ("DII Properties"), and Spartan Payment Solutions, LLC ("Spartan") (these entity defendants are collectively referred to herein as the "Shell Company Defendants").

## SUMMARY

After a three-week bench trial in 2009, the United States District Court for the Northern District of Texas entered judgment against Defendant Dominic J. Magliarditi ("Dominic") for $4.4 million for violating the RICO statute through repeated acts of mail and wire fraud.[1]  The Court also found at the conclusion of the trial that Dominic had willfully provided false sworn testimony concerning material matters in an effort to influence the outcome of the proceedings.[2]  The Fifth Circuit Court of Appeals affirmed the Judgment in all respects in June 2014.  To date, Dominic has paid essentially nothing on the Judgment.[3]  He is liable on the Judgment for at least $4,486,725, plus post-judgment interest that continues to accrue.

Instead of paying the judgment, Dominic and his spouse, Francine Magliarditi ("Francine"), are working together to defraud TransFirst from collecting on the Judgment by hiding and transferring assets through the use of a labyrinth of layered shell companies and trusts.  These purported "companies" and "trusts" are shams, existing for no reason other than to hide assets, defraud TransFirst, and otherwise act as the alter ego of Dominic.  Francine, the Magliarditi Trusts, and the Shell Company Defendants are alter-egos of Dominic and, therefore,

---

[1] Third Amended Final Judgment, entered April 22, 2013, Dkt. No. 376, United States District Court for the Northern District of Texas, in the case-styled *TransFirst Holdings, Inc., et al. v. Dominic J. Magliarditi, et al.*, Case No. 3-06CV2303 (the "Judgment").

[2] Order, March 8, 2011, Dkt. No. 314, United States District Court for the Northern District of Texas, in the case-styled *TransFirst Holdings, Inc., et al. v. Dominic J. Magliarditi, et al.*, Case No. 3-06CV2303 ("In sworn documents executed prior to trial, defendant Dominic J. Magliarditi gave false testimony concerning material matters before the court with the willful intent to provide false testimony to the court and with the intent to influence the proceedings, including the [(1) sworn Declaration dated February 19, 2008, (2) sworn Declaration dated February 19, 2008, (3) sworn First Amended Responses to Payment International, LLC's First Set of Interrogatories; and (4) sworn Responses to PRI, LLC's First Set of Interrogatories].").

[3] Dominic Magliarditi recently paid approximately $60 toward the Judgment in response to the Northern District of Texas having granted TransFirst's Application for a Turnover Order.  *See* Order, entered March 29, 2106, Dkt. No. 422, in United States District Court for the Northern District of Texas, in the case-styled *TransFirst Holdings, Inc., et al. v. Dominic J. Magliarditi, et al.*, Case No. 3:06-cv-2303-P.

**FIRST AMENDED COMPLAINT**                                                                 **2**

they should each be held jointly and severally liable with Dominic on the Judgment.  Put simply, the acts of these companies and trusts *are the acts of Dominic* and *their assets are actually Dominic's assets*.   Dominic exercises total control over the assets and property that are purportedly held under the legal names of Francine, the Shell Company Defendants, and the Magliarditi Trusts, and Dominic uses these assets and items of property for his own selfish benefit, and to the harm and detriment of his creditors, including TransFirst.  A unity between and among Dominic, on the one hand, and Francine, the Magliarditi Trusts, and the Shell Company Defendants, on the other, is such that treating Francine, the Magliarditi Trusts, and the Shell Company Defendants, as separate legal entities would result in a fraud and injustice perpetrated against TransFirst.

Additionally, Francine, the Magliarditi Trusts, and the Shell Company Defendants are each "transferees" under the Texas Uniform Fraudulent Transfer Act. Therefore, TransFirst requests that the Court set aside each and every fraudulent conveyance of assets made to or from Francine, the Magliarditi Trusts, or the Shell Company Defendants, and subject those illegally transferred assets to TransFirst's Judgment.  TransFirst also seeks to recover punitive damages and attorneys' fees to the full extent allowed by law.

## PARTIES

1.      Plaintiff TransFirst Group, Inc. f/k/a TransFirst Holdings, Inc. is a Delaware corporation having its principal place of business in Hauppauge, New York and, therefore, is a citizen of both Delaware and New York.   *See Hertz Corp. v. Friend*, et al., 559 U.S. 77, 94 (2010).  TransFirst Group, Inc. is a judgment-creditor on the Judgment.

2.      Plaintiff TransFirst Third Party Sales, LLC f/k/a TransFirst Merchant Services, Inc. is a Delaware limited liability company having only one member.  Its sole member is

TransFirst Group, Inc.  Because TransFirst Group, Inc. is a citizen of Delaware and New York, TransFirst Third Party Sales, LLC is also a citizen of Delaware and New York. TransFirst Third Party Sales, LLC is a judgment-creditor on the Judgment.

3.      Plaintiff Payment Resources International, LLC, is a Delaware limited liability company having only one member.  Its sole member is TransFirst Group, Inc.  Because TransFirst Group, Inc. is a citizen of Delaware and New York, Payment Resources International, LLC is also a citizen of Delaware and New York.  Payment Resources International, LLC is a judgment-creditor on the Judgment.

4.      Defendant Dominic J. Magliarditi is a natural person domiciled at 9501 Canyon Mesa Dr., Las Vegas, NV 89144, and is the spouse of Francine Magliarditi.  Therefore, Mr. Magliarditi is a citizen of Nevada.  *See Freeman v. Northwest Acceptance Corp*., 754 F.2d 553, 555-56 (5th Cir. 1985).

5.      Defendant Francine Magliarditi is a natural person domiciled at 9501 Canyon Mesa Dr., Las Vegas, NV 89144, and is the spouse of Judgment-Debtor Dominic J. Magliarditi. Therefore, for diversity purposes, Francine Magliarditi is a citizen of Nevada.  *See id.*  This action is asserted against Ms. Magliarditi in both *her individual capacity* and in her purported *capacity as trustee* of the FRM Trust, the DJM Magliarditi Trust, and the FANE Trust.  The citizenship of a trust is that of its trustee.  Therefore, because Ms. Magliarditi is a citizen of Nevada, each of these three trusts (i.e., the FRM Trust, the DJM Magliarditi Trust, and the FANE Trust) is a citizen of Nevada.  *See Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 464 (1980). Ms. Magliarditi (and each of the three trusts) has been served with process.

6.      Defendant ATM Enterprises, LLC is a limited liability company organized under the laws of the State of Nevada.  ATM Enterprises, LLC has only one member, namely, the

FANE Trust.  Because the FANE Trust is a citizen of Nevada, ATM Enterprises LLC is also a citizen of Nevada.  *See Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008). ATM Enterprises was served through its President, Secretary, and Treasurer Francine Magliarditi.

7.      Defendant DII Capital, Inc. is a corporation organized under the laws of the State of Nevada, and maintains its principal place of business in the State of Nevada.  Therefore, DII Capital, Inc. is a citizen of Nevada.  *Hertz Corp.*, 559 U.S. at 94. DII Capital, Inc. was served through its President, Secretary, and Treasurer Francine Magliarditi.

8.      Defendant DFM Holdings Ltd. is a limited partnership organized under the laws of the State of Nevada. "*DFM*" stands for *Dominic Francine Magliarditi*.  DFM Holdings Ltd.'s general partner is FRM Trust.  It has one limited partner, namely, DII Capital, Inc.  FRM Trust and DII Capital, Inc. are citizens of Nevada.  Therefore, DFM Holdings, Ltd. is a citizen of Nevada.  *Carden v. Arkoma Assocs.*, 494 U.S. 185, 195-96 (1990). DFM Holdings, Ltd. was served through Francine Magliarditi, trustee of FRM Trust and President of DII Capital, Inc.

9.      Defendant DFM Holdings LLP is a limited liability partnership organized under the laws of the State of Nevada.  "*DFM*" stands for *Dominic Francine Magliarditi*.  DFM Holdings LLP's only partners are FRM Trust and DII Capital, Inc.  FRM Trust and DII Capital, Inc. are citizens of Nevada.  Therefore, DFM Holdings, LLP is a citizen of Nevada.  DFM Holdings LLP was served through Francine Magliarditi, trustee of FRM Trust and President of DII Capital, Inc.

10.      Defendant DII Properties, LLC is a limited liability company organized under the laws of the State of Nevada.  DII Properties LLC's only member is the FANE Trust.  Because the FANE Trust is a citizen of Nevada, DII Properties LLC is also a citizen of Nevada.  *See*

*Harvey*, 542 F.3d at 1080. DII Properties was served through Francine Magliarditi, as trustee of the FANE Trust and President of DII Properties LLC.

11.      Defendant Spartan Payment Solutions, LLC is a limited liability company organized under the laws of the State of Nevada.  Spartan Payment Solutions, LLC has only one member, namely, the FANE Trust.  The FANE Trust is a citizen of Nevada, and, therefore, Magliarditi, LLC is also a citizen of Nevada.  *See id*.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction over this action pursuant to 28 USC §1332.  This Courts has original jurisdiction over this case because there is complete diversity among the parties and the amount in controversy exceeds $75,000.

13.      The Court has personal jurisdiction over Dominic Magliarditi because, among other reasons, he is a named debtor on a Judgment entered by the Northern District of Texas, and he is currently before the Court in a related proceeding, styled as *TransFirst Holdings, Inc., et al. v. Dominic J. Magliarditi, et al*., Case No. 3-06CV2303, in the United States District Court for the Northern District of Texas.

14.      This Court also has personal jurisdiction over the other Defendants. First, Defendants have participated (and are still participating) in a scheme to fraudulently transfer assets to prevent a judgment-creditor from collecting on a Texas Judgment in violation of the Texas Uniform Fraudulent Transfer Act.  *See e.g., Sourcing Mgmt., Inc. v. Simclar, Inc.*, 118 F. Supp. 3d 899, 911 (N.D. Tex. 2015) ("Similarly, the court finds persuasive a recent unpublished decision, in which the Fifth Circuit reversed the district court, and held that personal jurisdiction over out-of-state defendants was present where plaintiff alleged that defendants allegedly participated in a scheme to fraudulently transfer assets to prevent a Texas creditor/plaintiff from

collecting a pre-exiting Texas judgment in violation of TUFTA.").  Additionally, federal courts

"have consistently acknowledged that it is compatible with due process for a court to exercise

personal jurisdiction over an individual or a corporation that would not ordinarily be subject to

personal jurisdiction in that court when the individual or corporation is an alter ego or successor

of a corporation that would be subject to personal jurisdiction in that court."[18] *Patin v.*

*Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002).  The "theory underlying

these [alter ego] cases is that, because the two corporations (or the corporation and its individual

alter ego) are the *same entity,* the jurisdictional contacts of one *are* the jurisdictional contacts of

the other for the purposes of the *International Shoe* due process analysis." *Id*.

15.     This Court is also the proper venue under 28 U.S.C. §1391.  Venue is proper in

this district because this Court has continuing jurisdiction over the enforcement of the Judgment,

which is a substantial part of the property that is the subject of this action, and because a

substantial portion of the facts giving rise to this cause occurred in this district, and finally,

because Dominic who is a defendant in this action is already before this Court on a related cause

of action that should be consolidated with this cause for purpose of judicial economy and

efficiency.  For instance, this Court previously denied a motion to transfer venue under similar

facts:

> As noted above, Plaintiff's selection of this forum was proper. *See* 28 U.S.C. §
> 1391(a)(2). Plaintiff resides in this District, and all of the events that led to the
> present action, including issuance of a judgment, took place in this District.
> Therefore, a legally relevant factual nexus exists between Plaintiff and her claim
> on the one hand, and the claim and the forum on the other. Furthermore, there is
> no indication that Plaintiff's selection of this District was motivated by a desire to
> harass or inconvenience her adversary. Plaintiff's selection of the Northern
> District of Texas is both appropriate under the relevant legal standard and logical

given the nature of the claim. Accordingly, Plaintiff's decision to litigate in this District, while not determinative, should be afforded significant deference.[4]

**JURY DEMAND**

16.     TransFirst hereby demands a jury trial on all matters that may be tried to a jury.

**FACTUAL BACKGROUND**

**A.      The Underlying Lawsuit and Fraud Judgment Against Dominic Magliarditi**

17.     On December 13, 2006, TransFirst commenced suit in federal court against Dominic J. Magliarditi ("Magliarditi"), among other entities, for breach of fiduciary duty, common law fraud, and statutory violations under the RICO Statute (18 U.S.C § 1962(c) and (d)).[5]

18.     The case was tried before the United States District Court for the Northern District of Texas for thirteen days in May 2009.  The Court rendered its initial Findings of Fact and Conclusions of Law on January 19, 2010,[6] and, in an Order entered March 8, 2011,[7] amended its Findings of Fact and Conclusions of Law to include, among other things, additional findings in further support of its conclusions of law relevant to assessing exemplary damages against Magliarditi.  Of particular import, the Court found that Magliarditi had repeatedly lied under oath in sworn interrogatory responses and affidavits.

---

[4] *Scheble v. Davenport*, No. 3:07-cv-0189, 2007 WL 1893364, at *3 (N.D. Tex. June 29, 2007) (internal citations omitted).

[5] Plaintiffs' Original Complaint and Application for Preliminary and Permanent Injunctive Relief, filed on December 13, 2006, Docket No. 1, in the action styled *TransFirst Holdings, Inc., et al. v. Dominic J. Magliarditi, et al.*, Case No. 3-06CV2303, in the United States District Court for the Northern District of Texas.

[6] Finding of Facts and Conclusion of Law, filed January 19, 2010, Docket No. 290, *TransFirst Holdings, Inc., et al. v. Dominic J. Magliarditi, et al.*, Case No. 3-06CV2303, in the United States District Court for the Northern District of Texas**.**

[7] Order, filed on March 8, 2011, Docket No. 314, *TransFirst Holdings, Inc., et al. v. Dominic J. Magliarditi, et al.*, Case No. 3-06CV2303, in the United States District Court for the Northern District of Texas.

**FIRST AMENDED COMPLAINT**                                                                                                 **8**

19.     In particular, defendant Dominic J. Magliarditi gave false testimony in sworn documents executed prior to trial concerning material matters with the willful intent to influence the proceedings.  The Court stated the following in its finding of fact:

> Magliarditi stated in his sworn declaration of February 19, 2008 filed with the court that EasyPay was not a payment processor and was not a competitor of plaintiffs.  At trial, Magliarditi admitted under oath that this statement was false when made and that he knew it was not true at the time he wrote it.

> Magliarditi stated in his sworn declaration of February 19, 2008, that EasyPay is owned and operated by Charles Oliverio.  At trial, Magliarditi admitted under oath that this statement was not true and that he knew it was not true at the time he wrote it.

> Magliarditi stated in his sworn First Amended Responses to Payment Resources International, LLC's First Set of Interrogatories that EasyPay consulted with telemarketing call centers.  At trial, Magliarditi admitted under oath that EasyPay provided other services that were not disclosed in his interrogatory answer, and that Magliarditi knew the sworn answer was not true at the time he wrote it.

> Magliarditi stated in his sworn Responses to PRI, LLC's First Set of Interrogatories that he understood and intended that EasyPay was in the business of consulting with telemarketing centers.  At trial, Magliarditi admitted under oath that he was not telling the truth at the time he wrote his interrogatory answer.[8]

20.     The Court entered its Final Judgment in favor of TransFirst on August 30, 2011,[9] which was then amended three times, resulting in the Third Amended Final Judgment April 22, 2013.[10]

---

[8] *Id.* at 6.

[9] Order, filed on August 30, 2011, Docket No. 323, *TransFirst Holdings, Inc., et al. v. Dominic J. Magliarditi, et al*., Case No. 3-06CV2303, in the United States District Court for the Northern District of Texas.

[10] Third Amended Final Judgment filed on April 22, 2013, Docket No. 376, *TransFirst Holdings, Inc., et al. v. Dominic J. Magliarditi, et al*., Case No. 3-06CV2303, in the United States District Court for the Northern District of Texas.

**FIRST AMENDED COMPLAINT**                                                                 **9**

**B.**   **Dominic Has Violated Nearly Every Conceivable Obligation When It Comes to Telling the Truth and Answering Post-Judgment Discovery**

21.     TransFirst began post-judgment discovery by serving interrogatories and document requests on Dominic.  To the extent Dominic answered, his answers were false and misleading.

22.     For instance, Dominic stated in sworn interrogatory answers that he had earned no salary in 2010 or 2011, and that he only earned $30,000 in 2012 and only $10,000 during the first half of 2013.  Dominic also said that he only owned one bank account, which he said had a balance of only $1.44, and that he was the signatory on an IRA account worth only $2,569.00.

23.     These disclosures were completely inconsistent with the personal financial statement that Dominic had circulated prior to the underlying trial, in which he reported a net worth exceeding $20 million.  Dominic's interrogatory answers were false.  When reviewing the scant few bank records that Dominic had produced along with his interrogatory answers, TransFirst found references to several other bank accounts that Dominic had not disclosed.  Moreover, some of the bank statements that Dominic produced showed significant incoming deposits and wire transfers (often exceeding $100,000 and sometimes more than a million dollars).  These deposits were nearly always followed soon thereafter by matching outgoing transfers to undisclosed accounts.

24.     Given these and other inconsistencies, TransFirst dug deeper into Dominic's financial records.  TransFirst obtained public records from the offices of the Secretary of State for California and Nevada, showing that Dominic had created or was closely associated with several companies and partnerships that he had never disclosed to TransFirst.[11]   TransFirst

---

[11] For example, DII Capital, Inc., ATM Enterprises, LLC, 1st Choice Advance, Inc., West Coast Floor Covering, Inc., LM Investments, Inc.

**FIRST AMENDED COMPLAINT**                                                                                   **10**

further obtained (through nonparty subpoenas) copies of bank records showing that Dominic controlled other bank accounts either under his own name or under the names of entities that he and Francine control such as DII Properties, LLC; Magliarditi, Ltd.; Chazzlive.com, LLC; and Spartan Payment Solutions, LLC.

25.     On June 26, 2014, TransFirst's counsel traveled to take Dominic's deposition in Huntington Beach, California (near Dominic and Francine's then-current residence).   The deposition, however, was a waste of time because Dominic—who is a licensed attorney in three States—refused to answer any questions about his undisclosed companies, trusts, and assets that he and Francine controlled. When Dominic did answer, his answers were intentionally evasive and misleading.   For example, he claimed not to remember anything about the matching incoming and outgoing wire transfers reflected in his bank statements. Even when TransFirst showed Dominic a bank statement evidencing a deposit for $109,383.29, followed by a matching, outgoing transfer the next day to an undisclosed bank account, Dominic claimed that he could not remember the transaction.   Dominic also refused to disclose any assets or debts belonging to his and Francine's community property estate.

26.     Thus, TransFirst filed a motion to compel and sought sanctions against Dominic in the Northern District of Texas, pursuant to this Court's continuing jurisdiction over the Judgment.[12]

---

[12]   *See* Plaintiffs/Judgment Creditor's Motion to Compel Discovery and for Sanctions, *TransFirst Holdings, Inc., et al. v. Dominic J. Magliarditi, et al.*, Case No. 3-06CV2303, in the United States District Court for the Northern District of Texas.

**C.      At the Court-Ordered Deposition, Dominic Testified Under Oath that Francine had Seized Control Over The Shell Companies That He Had Created And That The Companies Were Now Under Her Sole Control.**

27.      On August 6, 2015, the Northern District of Texas overruled Dominic's discovery objections, granted TransFirst's motion to compel, and sanctioned Dominic by ordering him to testify in another deposition at his expense, to be conducted in the Court's chambers in Dallas, Texas.[13]  Shortly before appearing at the Court-Ordered deposition, Dominic produced *a few* pages of documents, but his document production was woefully deficient.

28.      At the deposition on September 16, 2015 in the Court's chambers, Dominic provided false testimony on material matters relating to TransFirst's effort to recover on the Judgment.  Dominic made these false statements *knowingly* and with intention to deceive TransFirst and to prevent TransFirst from discovering important information about the location and value of his assets, income, and net worth.

29.      At the deposition, Dominic blamed Francine for his failure to produce the Court-Ordered financial and business records relating to the entities and trusts that were the subject of TransFirst's motion to compel.

30.      Dominic falsely testified at the deposition that Francine was purportedly so upset about TransFirst's discovery requests aimed at these companies that he decided to resign from all of the companies.  Dominic further testified that Francine had taken over sole control over the companies and, as a result, he said he no longer had access to or authority to produce the company-related documents, as ordered by the Court.

31.      There is no dispute that these so-called "companies" are closely held; were created by Dominic; have no employees other than "possibly" Francine and/or Dominic; and

---

[13] *See* Order, Dkt. No. 411, *TransFirst Holdings, Inc., et al. v. Dominic J. Magliarditi*, Case No. 3:06-cv-02303, (N. D. Tex. 2015).

have no officers or agents other than Dominic and Francine (or possibly other shell companies that Francine and Dominic created and control).[14]  The following is a representative sample of Dominic's false testimony, which he presented in Dallas in furtherance of his effort to defraud TransFirst out of the Judgment:

> Q: Is it your position that you don't possess or have access to any documents reflecting the identity of past shareholders of DII Capital?
>
> A:  Correct.
>
> Q:  Did you look for those kinds of records?
>
> A:  I looked to see if I had them in my possession, which I didn't and I didn't have access to any of the company records.
>
> Q:  So you didn't have possession of any responsive documents and you didn't have the ability to obtain copies of any responsive documents; is that right?
>
> A:  Correct.
>
> Q:  Who has the documents that would be responsive to request number three?
>
> A:   Those are company documents.
>
> Q:  I understand.  And the company's DII Capital?
>
> A:  Correct.
>
> Q:  And that's a business that you formed?
>
> A:   Correct.
>
> Q:  And that's a business that you were originally serving as the President and Treasurer and Secretary, correct?
>
> A:  That is correct.
>
> Q:  Who today is the President and Secretary of DII Capital?
>
> A:  Francine Magliarditi.
>
> Q:  Okay.  And that's your wife?

---

[14] Dominic Dep. Tr. (9/16/2015) at 19:25-20:8.

A:  Correct.

Q:  Would she have access to the documents that are responsive to request number three?

A:  I would assume she would.[15]

32.     Based on Dominic's sworn testimony, TransFirst sought to take Francine's deposition.

**D.     Francine Was Already in Violation of an Order from the Central District of California That Ordered Her to Testify in a Deposition in California Pursuant to one of TransFirst's Post-Judgment Discovery Subpoena.**

33.     This was not the first time TransFirst had sought Francine's deposition.  Nine months before Dominic testified in his Court-Ordered deposition in Dallas, TransFirst had served Francine with a subpoena *duces tecum* in California at her and Dominic's California residence.

34.     Francine ignored that subpoena.  No documents.  No testimony.  No response.

35.     TransFirst then filed a motion against Francine in the United States District Court for the Central District of California to enforce the discovery subpoena.  The California district court granted the motion, stating, among other things:[16]

> Here, Plaintiffs have raised enough to show that Mr. and Ms. Magliarditi may be working together to hide Mr. Magliarditi's assets.  For that reason, Plaintiffs are entitled to question her under oath.  IT IS HEREBY ORDERED that, no later than August 31, 2015, Francine Magliarditi appear for her deposition and bring with her the documents that are responsive to the subpoena.

36.     Francine never appeared for her court-ordered deposition in California.

---

[15] Dominic Dep. Tr. (9/16/15) at 15:13-16:22.

[16] *See* Plaintiffs/Judgment Creditors' Motion to Enforce Out-Of-State Discovery Subpoena, No. 8:15-mc-0011, Dkt. 1 (C.D. Cal. July 13, 2015), *TransFirst Holdings, Inc., et al. v. Francine Magliarditi*, Cause No. 8:15-mc-00011, in the United States District for the Central District of California, at 2-3 ("Here, Plaintiffs have raised enough to show Mr. and Ms. Magliarditi may be working together to hide Mr. Magliarditi's assets.  For that reason, Plaintiffs are entitled to question her under oath.  IT IS HEREBY ORDERED THAT, no later than August 31, 2015, Francine Magliarditi appear for her deposition and bring with her the documents that are responsive to the subpoena.").

**E.     Based on Dominic's Court-Ordered Deposition Testimony in Texas, TransFirst Again Served Francine with Discovery Subpoenas—this Time In Nevada—And, Again, Francine Refused to Testify.**

37.     Given Dominic's sworn deposition testimony in Dallas, TransFirst again sought to take Francine's deposition.  Francine, however, intentionally evaded service for three months.  Finally, on December 15, 2015, after numerous failed attempts, TransFirst was finally able to serve Francine with three discovery subpoenas at her and Dominic's other residence in Las Vegas, Nevada.

38.     One subpoena was directed to Francine, individually, and the other two were directed to DII Capital and ATM Enterprises, respectively, seeking depositions under Rule 30(b)(6).

39.     Through her Nevada counsel, Francine offered a specific date for her deposition, which TransFirst accepted.  Yet, the day before her deposition, Francine filed two emergency motions, seeking to quash the subpoenas and asserting spousal privilege.  The Nevada district Court denied both of Francine's emergency motions.

40.     When TransFirst's counsel traveled to Las Vegas to take the depositions, Francine refused to appear or testify, again asserting spousal privilege.

41.     TransFirst was again forced to file a motion seeking to overrule Francine's assertions of privilege and compel her to comply with the subpoenas.  This time TransFirst filed its motion in the United States District Court for the District of Nevada, the court having jurisdiction over the Nevada subpoenas.

42.     The Nevada court granted TransFirst's motion, overruled Francine's meritless assertions of spousal privilege, and ordered her to testify in a deposition within thirty days.[17]

43.     The three depositions (e.g., for Francine, DII Capital, and ATM Enterprises) were conducted simultaneously on June 29, 2016, pursuant to the district court order.

**F.    Francine's Deposition Testimony Confirms that Dominic is Hiding Assets in a Myriad of Alter-Ego Companies and Sham Trusts.**

44.     Francine's deposition testimony was a disaster for Dominic.

45.     Francine's testimony proved that Dominic's various entities and trusts are shams, designed for the sole purpose of deceiving TransFirst and the legal system.  The legal structures that exist are in form only, as there is no substance.  For example, although Dominic may have removed himself as an officer from the formal filings with the State of Nevada for the Shell Company Defendants, and even though he claims to have purportedly transferred ownership of the companies to Francine, other companies, or any of the Magliarditi Trusts, he is still controlling every aspect of every business and financial decision affecting these companies.

46.     Importantly, whenever Dominic needs money for any personal reason whatsoever, he simply takes whatever money he wants from any of the Shell Company Defendants or the Magliarditi Trusts.

47.     Francine testified that she was the "President" of DII Capital and ATM Enterprises that she "may" even be the "President" of other companies that her and Dominic created, but she was uncertain as to which other companies she purportedly may manage.

---

[17] Order, entered June 5, 2015, Dkt. No. 26, in the matter styled *TransFirst Holdings, Inc. et al. v. Dominic J. Magliarditi*, No. 2:16-cv-00322-APG-NJK, in the United States District Court for the District of Nevada.

48.     Repeatedly, Francine testified at her deposition that TransFirst's counsel should look to Dominic for answers to any questions about the Shell Company Defendants or the Magliarditi Trusts.

49.     As for ATM Enterprises, DFM Holdings I and II, and DII Capital, Francine repeatedly testified that she had no idea how any of these companies make money, operate, conduct business, or whether any of them has any customers or owns property.  She testified that she does no know whether they own any real estate, securities, cash, or anything else.  She testified that only Dominic would know the answer to these basic questions.

50.     Francine was clear that she lacks the training or capability to read a financial statement or a general ledger and that she relies on Dominic to handle all of the financial transactions relating to DII Capital and ATM Enterprises, as well as the other Shell Company Defendants.  She testified that he alone controls the books and records for both companies—once again proving that Dominic's testimony in Dallas about losing control over the companies and the documents was false.

51.      Francine further testified that *whenever* she needs money to pay for personal expenses for her or any member of her family, including Dominic, she either withdraws the money herself from DII Capital, ATM Enterprises, DFM Holdings I and II, or alternatively, she simply asks Dominic to get the money.

52.     Francine confirmed that Dominic regularly withdraws whatever amount of money he thinks he or she may want, and that he withdraws this money from DII Capital, ATM Enterprises, DFM Holdings I and II, and any other company or trust that he and she control.

53.     Francine confirmed that she has no idea how Dominic determines which of the companies should pay for any given personal expense, and that she has no idea how Dominic

**FIRST AMENDED COMPLAINT**                                                                                   **17**

determines how much money any given company should pay at any given time. Francine repeatedly testified that Dominic makes all decisions as to which companies should distribute money, how much money should be distributed, and to whom it should be distributed.

54.     Francine's sworn testimony confirms that, at best, she is a nominal owner and officer of some of the Shell Company Defendants, and that she has no real impact or influence on any of these sham companies.

55.     Francine's testimony regarding the Magliarditi Trusts was equally revealing.  At her deposition, Francine was unable to describe any assets or property held in trust, nor could she remember whether she had ever made any distributions of property from any of the trusts to any beneficiaries.

56.     Francine did not know whether the trusts owned any cash, real estate, bank accounts, stocks, securities, or other items of property.

57.     Francine admitted that she kept no written records relating to any of the Magliarditi Trusts and that she did not know of any restrictions placed on her regarding when and whether she could distribute property to the beneficiaries.

58.     After serving a myriad of third party subpoenas and obtaining documents from Francine, it is clear that Dominic and Francine have plenty of money to pay the Judgment, but simply refuses to do so.  Instead of complying with their financial obligations, Francine and Dominic are hiding and transferring assets to shell companies and trusts that Dominic controls.

59.     Dominic, by and through his many alter egos, which include Francine, the Magliarditi Trusts, and the Shell Company Defendants, Dominic has made or has caused to be made numerous fraudulent transfers.   These transfers should be set aside under the Texas

Fraudulent Transfer Act and the equivalent value of these transfers should be seized and paid to TransFirst in satisfaction (or in partial satisfaction) of the Judgment.

60.     The fraudulent conveyances are far too many in number to set out specifically in any pleading, as they have been ongoing on a daily basis for many years, but for illustrative purposes only, TransFirst offers the following as a non-exhaustive summary list of *some* of the fraudulent transactions:

- On July 1, 2014, Dominic transferred more than $1.4 million to ATM Enterprises.

- On July 1, 2014, Dominic caused ATM Enterprises to transfer more than $1.4 million into other bank accounts that he controls at Wells Fargo, among other accounts.

- On July 2, 2014, Dominic transferred $350,000 from his own personal checking account to an account maintained under the name DII Capital, which he controls.

- On July 2, 2014, Dominic transferred $900,000 from his personal checking account into a savings account held under the name DII Capital, which he controls.

- Over the past two years, Dominic has caused DII Capital to transfer more than $1 million to ATM Enterprises.

- On October 14, 2015, Dominic caused DII Capital to purchase a new BMW for one his children, for $40,137.57.

- Every month, Dominic causes DII Capital, ATM Enterprises, DMF Holdings, and other Shell Company Defendants, as well as the Magliarditi Trusts, to pay the personal expenses reflected on his and Francine's credit cards.

- Nearly every month Dominic causes DII Capital, ATM Enterprises, DMF Holdings, and other Shell Company Defendants, as well as the Magliarditi Trusts, to pay for Francine's Bloomingdale credit card bills, Nordstrom credit cards, and other luxury shopping and dining bills.

- For the past several years, Dominic has caused DII Capital, ATM Enterprises, DMF Holdings, and other Shell Company Defendants, as well as the Magliarditi Trusts, to pay for his and Francine's rental payments on two luxury residences, one in California and the other in Nevada.

- For the past several years, Dominic has caused DII Capital, ATM Enterprises, DMF Holdings, and the other Shell Company Defendants, as well as the Magliarditi Trusts, to pay for his and Francine's lease payments on their luxury vehicles, consisting of at least two Mercedes Benz.

**FIRST AMENDED COMPLAINT**                                                          **19**

- For the past several years, Dominic has caused DII Capital, ATM Enterprises, DMF Holdings, and the other Shell Company Defendants, as well as the Magliarditi Trusts, to pay for his and Francine's personal vacations, including plane tickets, luxury hotels, rental cars, and fine dining.

- For the past several years, Dominic has caused DII Capital, ATM Enterprises, DMF Holdings, and the other Shell Company Defendants, as well as the Magliarditi Trusts, to pay for the college tuition bills for their children, which include bills for prestigious universities and medical school.

- Over the past two years, Dominic has caused DII Capital, ATM Enterprises, DMF Holdings, and the other Shell Company Defendants, as well as the Magliarditi Trusts, to hundreds of thousands of dollars directly to Francine.

- Over the past two years, Dominic has caused DII Capital, ATM Enterprises, DMF Holdings, and the other Shell Company Defendants, as well as the Magliarditi Trusts, to pay hundreds of thousands of dollars directly to Francine for her personal benefit.

- Over the past several years, Dominic has caused DII Capital, ATM Enterprises, DMF Holdings, and the other Shell Company Defendants, as well as the Magliarditi Trusts, to transfer more than $150,000 to ChazzLive, Rembrandt, Steve McDonald, and Mags 20.

- Over the past several years, Dominic has caused DII Capital, ATM Enterprises, DMF Holdings, and the other Shell Company Defendants, as well as the Magliarditi Trusts, to transfer tens of thousands of dollars to DJM Irrevocable Trust, a trust for which Francine purportedly serves as trustee but is controlled by Dominic.

- Over the past several years, Dominic has caused DII Capital, ATM Enterprises, DMF Holdings, and the other Shell Company Defendants, as well as the Magliarditi Trusts, to transfer tens of thousands of dollars to FRM Trust, a trust for which Francine purportedly serves as trustee but is controlled by Dominic.

- Over the past several years, Dominic has caused DII Capital, ATM Enterprises, DMF Holdings, and the other Shell Company Defendants, as well as the Magliarditi Trusts, to transfer tens of thousands of dollars to the FANE Trust, a trust for which Francine purportedly serves as trustee but is controlled by Dominic.

- Over the past several years, Dominic has caused DII Capital, ATM Enterprises, DMF Holdings, and the other Shell Company Defendants, as well as the Magliarditi Trusts, to enter into intercompany loans, between and among each other, purportedly worth millions of dollars.

- Over the past several years, Dominic has caused DII Capital, ATM Enterprises, DMF Holdings, and the other Shell Company Defendants, as well as the Magliarditi Trusts, to transfer tens of thousands of dollars to FRM Trust, a trust for which Francine testified is no longer active but was previously controlled by Dominic.

- Over the past several years, Francine and Dominic have caused DII Capital, ATM Enterprises, DMF Holdings, and the other Shell Company Defendants, as well as the Magliarditi Trusts to transfer tens of thousands dollars to DFM Holdings I and DFM Holdings II, respectively, both of which are controlled by Dominic.

- Over the past several years, Francine and Dominic have caused DII Capital to transfer more than $100,000 to DII Properties, another sham company controlled by Dominic.

- Over the past several years, Dominic has fraudulent transferred millions of dollars into and out of DII Capital, ATM Enterprises, DMF Holdings, and the other Shell Company Defendants, as well as the Magliarditi Trusts, for purpose of defrauding creditors, including TransFirst.

61.     The companies and trusts involved in these transactions are shams and alter egos of Dominic.   TransFirst learned about these fraudulent Transfers, among others, only after serving numerous nonparty discovery subpoenas, which it was then required to enforce through at least three different motions to compel, each needing to be filed in different jurisdictions (namely, Texas, California, and Nevada).

62.     TransFirst now brings this lawsuit in an effort to bring all of Dominic's alter egos before the Court, set aside the myriad of fraudulent transfers made between, and among, Dominic, Francine, the Magliarditi Trusts, and the Shell Company Defendants, and to finally collect on the Judgment that was entered in TransFirst's favor several years ago by this Court.

## CLAIMS

**A.     Fraudulent Transfers Under the Texas Uniform Fraudulent Transfer Act.**

63.     The matters set forth in the preceding paragraphs are incorporated by reference as though fully stated herein.

64.     Rule 69(a)(1) of the Federal Rules of Civil Procedure directs the court to look to the law of the host state to determine the procedure for "proceedings supplementary to and in aid of judgment. . . ."   Likewise, Rule 64(a) provides that every state law remedy (of the state where the court is located) is available to secure satisfaction of a judgment.

65.     The Texas Civil Practice & Remedies Code details remedies available to satisfy a judgment.

66.     In Texas, it has long been held that a creditor in the same suit may recover judgment on its demand and also have a fraudulent conveyance set aside.  However, the plaintiff creditor must bring a separate action, which joins the transferee.

67.     The Texas version of the Uniform Fraudulent Transfer Act is found in Chapter 24 of the Texas Business and Commerce Code.

68.     The Judgment against Dominic is a valid, subsisting debt.  The Judgment is just, due, and remains unpaid, and TransFirst is a creditor on the Judgment.

69.     Dominic and Francine have conspired together to hide and conceal from TransFirst for purpose of preventing TransFirst from collecting on the Judgment.

70.     Under § 24.006(b), a transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

71.     TransFirst incorporates by reference the previously described financial transactions, including, among others, those transactions described above in Paragraph 60, the financial transactions reflected in the general ledger for DII Capital (DIICAP000080-305), and the financial transactions reflected in the general ledger for ATM Enterprises (ATM000040-92),

as well as all subsequent transfers involving the same assets or items of property (collectively, the "Fraudulent Transaction").[18]

72.     TransFirst further alleges that any and all transfers made, between or among any of the Shell Company Defendants or the Magliarditi Trusts also qualify as fraudulent transfers under the Texas Uniform Fraudulent Transfers Act.

73.     Each of the Fraudulent Transfers described herein was made to an insider by Dominic, or by a Defendant acting at Dominic's direction, and was made after TransFirst's claim against Dominic arose.

74.     At all relevant times following entry of the Judgment, Dominic has claimed to be financially broke.  In fact, Dominic testified under oath in a post-Judgment deposition that he has never had money on which to pay any portion of the Judgment owed to TransFirst.  Francine testified at her deposition that Dominic does not own any property, does not earn a salary, and has no source of income other than to rob assets from the Shell Company Defendants and the Magliarditi Trusts.

75.     Each of the insiders had reason to know that Dominic was insolvent at the time of each Fraudulent Transfer because Dominic controls each of the insiders, and they each act on his behalf and solely at his direction.  Indeed, as previously described and further described below, each insider is an alter ego of Dominic.

76.     Under § 24.005(a), a transfer made or obligation incurred by a debtor is also deemed fraudulent, whether the creditor's claim arose before or within a reasonable time after the

---

[18] DII Capital and ATM Enterprises produced these general ledgers, by and through their counsel, in response to discovery served by TransFirst on December 15, 2015.  Their counsel requested at Francine's deposition that TransFirst maintain the confidential nature of these ledgers, and, therefore, pending an order to seal, TransFirst filed only a redacted version of these documents in the public records of the Court, on June 30, 2016, attached as Exhibit 1 and 2 to the [Original] Complaint (Dkt. No. 1).

transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor.

77.     Each of the Fraudulent Transfers described herein was made by Dominic, or by a Defendant acting at Dominic's direction and under his control, and was made with actual intent to hinder, delay, and defraud TransFirst.

78.     A transfer or obligation incurred is also fraudulent under § 24.005(a) if the transfer was made or the obligation was incurred without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

79.     Dominic did not receive reasonably equivalent value in exchange for any of the Fraudulent Transfers, and he made these transfers (either personally or through the acts of another who was under his control and acting at his direction) at a time when he was engaged in or about to engage in a business transaction for which the remaining assets were unreasonably small in relation to the business transaction or at a time when he intended to incur or reasonably should have believed he would incur debts beyond his ability to pay as they became due.

80.     Dominic has maintained control and beneficial ownership over the money, assets, property, and business interests that were purportedly transferred away in the Fraudulent Transactions.

81.     TransFirst has been harmed as a result of each of the Fraudulent Transfers.

82.     TransFirst respectfully requests that the Fraudulent Transactions be found to be fraudulent conveyances; that the Court set the transactions aside and deem same null and void to the extent possible; that the Court turn such assets transferred or their equivalent value over to TransFirst and/or otherwise grant a judgment against Defendant(s) to whom such assets were transferred in the amount equivalent to the value of the asset on the date of the fraudulent transfer or at the time of judgment, whichever is greater; and award TransFirst all other damages, including punitive damages, costs, fees (including, but not limited to attorneys' fees) and all other relief the Court deems just under the circumstances.

83.     TransFirst further seeks an injunction against Dominic, Francine, the Shell Company Defendants, the Magliarditi Trusts, and all of their agents, prohibiting further disposition by any of them or any of their transferees, of any asset or property transferred in the Fraudulent Transactions.

84.     TransFirst further seeks to freeze accounts and enjoin Dominic, Francine, the Shell Company Defendants, the Magliarditi Trusts, and all of their agents, from withdrawing, disposing, or otherwise transferring funds, between or among each other, from opening or closing any financial accounts, including, but not limited to checking, savings, brokerage, investment, and other accounts, from creating any new legal entities, or from otherwise disposing or transferring away any assets, property, income, profits, or revenue, without first obtaining written approval from the Court or an appointed receiver.

85.     TransFirst further requests that the Court appoint a receiver to take charge of the Shell Company Defendants and the Magliarditi Trusts, as well as any of their parents, affiliates, subsidiaries, or sister companies, and to take charge over any assets, real and personal property,

**FIRST AMENDED COMPLAINT**                                                           25

income, profits, and financial accounts that these Shell Company Defendants and Magliarditi Trusts purportedly own, possess, or control.

**B.      Unjust Enrichment**

86.      The matters set forth in the preceding paragraphs are incorporated by reference as though fully stated herein.

87.      Defendants have committed actual fraud through the transferring of Dominic's assets (including, but not limited to, assets belonging to Dominic and Francine's marital, community estate which is jointly and severally liable on the Judgment) to insiders and others who they are affiliated with or over whom they exercise control in order to defraud TransFirst and render collection of the Judgment against Dominic impossible.

88.      Defendants have been unjustly enriched as a result of Defendants' fraudulent conduct.

89.      The assets that were transferred in the Fraudulent Transactions described herein, represent traceable and identifiable property consisting of money, property, and business interests and, therefore, represent an identifiable res upon which to institute a constructive trust.

90.      TransFirst respectfully requests that the Court enter a Judgment in its favor awarding a constructive trust over all money and property transferred in the Fraudulent Transfers, and award all other damages, including punitive damages, all costs, fees and all other relief the Court deems just and appropriate under the circumstances.

**C.      Francine Magliarditi, the Magliarditi Trusts, and the Shell Company Defendants are each an Alter Ego of Dominic Magliarditi.**

91.      The matters set forth in the preceding paragraphs are incorporated by reference as though fully stated herein.

92.     An alter ego remedy is a type of equitable relief available "when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." *Clapper v. Am. Realty Inv'rs, Inc.*, No. 3:14-CV-2970-D, 2015 WL 3504856, at \*9 (N.D. Tex. June 3, 2015); *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 302 (5th Cir. 2007); Nev. Rev. Stat. § 78.747 (2015).

93.     Traditional veil-piercing uses the alter ego doctrine to break through corporate formalities and include the assets of a shareholder or other corporate insider as assets of a corporation. *See In re Moore*, 379 B.R. 284, 291 (Bankr. N.D. Tex. 2007) (discussing traditional use of corporate veil piercing to "mak[e] a shareholder liable for a corporation's contractual debts"); *LFC Mktg. Grp., Inc. v. Loomis*, 116 Nev. 896, 8 P.3d 841, 846 (Nev. 2000) ("[T]he classic alter ego situation involves a creditor reaching the personal assets of a controlling individual to satisfy a corporation's debt[.]").

94.     Reverse veil-piercing, which is a common law doctrine recognized in many states, including Nevada and Texas, renders the assets of a corporation liable for the debts of a corporate insider based on a showing that the corporate entity is actually the alter ego of the individual.  *See Clapper v. American Realty Investors, Inc.*, No. 3:14-cv-2970, 2015 WL 3504856, at \*9 (N.D. Tex. June 3, 2015); *Moore*, 379 B.R. at 292 (noting that reverse veil-piercing "appl[ies] the traditional veil piercing doctrine in reverse, so that a corporation's assets are held accountable for the liabilities of individuals who treated the corporation as their alter ego" (citing *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 243 (5th Cir.1990))); *LFC Mktg. Grp.*, 8 P.3d at 846 ("[T]he 'reverse' piercing situation involves a creditor reaching the assets of a corporation to satisfy the debt of a corporate insider based on a showing that the corporate entity is really the alter ego of the individual.").

**FIRST AMENDED COMPLAINT**                                                    27

95.     The elements for finding an alter ego are:  (1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction [a] fraud or promote injustice.

96.     A unity between and among Dominic, on the one hand, and Francine, the Magliarditi Trusts, and the Shell Company Defendants, on the other, is such that treating Francine, the Magliarditi Trusts, and the Shell Company Defendants, as separate legal entities would result in a fraud and severe injustice perpetrated against TransFirst.

97.     Dominic controls Francine, the Magliarditi Trusts, and the Shell Company Defendants as his instruments to defraud TransFirst and prevent TransFirst from collecting on any portion of the Judgment.

98.     Among other things, Dominic uses Francine, the Magliarditi Trusts, and the Shell Company Defendants to shelter and hide his assets, income, and net worth from TransFirst, and to divert his assets, income, and net worth away from TransFirst's reach.

99.     The Shell Company Defendants and the Magliarditi Trusts are inadequately capitalized, their funds are commingled, and their records are either missing entirely or created after-the-fact in response to post-judgment discovery requests.

100.    Dominic uses the corporate form of these entities to obfuscate and hide the true source of his assets, income, and net worth.  Indeed, even though TransFirst has obtained bank records from nonparty banks showing that millions of dollars have been deposited into and then withdrawn from the Shell Company Defendants and Magliarditi Trusts over the past several

years, Dominic still repeatedly refuses to disclose the true source of any of the funds or disclose the identify of the recipients who, in turn, receive the outgoing funds from these entity accounts.

101.    Dominic and Francine readily admit that it is their practice to cause the Shell Company Defendants and the Magliarditi Trusts to pay for nearly all of their family's personal expenses in support of their lavish two-house lifestyle.

102.    Dominic transfers money and property, between and among, the Shell Company Defendants and Magliarditi Trusts, which Dominic then uses to pay for his and his family's personal expenses, including, among other things, luxury BWM and Mercedes Benz car payments, house lease payments, tennis club memberships, insurance premiums, personal credit card bills, vacation expenses, tuition expenses for their children, fine dining expenses, expensive jewelry, and shopping bills as luxury and designer clothing stores.

103.    Dominic, individually, and through Francine, co-mingle the funds of the Shell Company Defendants and the Magliarditi Trusts, and use the funds of these companies for their own personal benefit to the harm and detriment of their creditors.

104.    Dominic uses each of the Shell Company Defendants and Magliarditi Trusts to hide his personal assets and income.

105.    Francine is an "officer" and "trustee" in name only is simply assigned job titles in order to further shelter Dominic.  Dominic, although he purportedly "resigned" as officer of the Shell Company Defendants, he is the sole *de facto* officer, director, and owner of the Shell Company Defendants and the *de facto* trustee of the Magliarditi Trusts.  He controls Francine, the Shell Company Defendants, and the Magliarditi Trusts.

106.    The Shell Company Defendants and the Magliarditi Trusts are sham entities, designed to defraud Dominic's creditors, including TransFirst.

**FIRST AMENDED COMPLAINT**                                                                                      **29**

107.    Dominic and Francine have conspired together to abuse the corporate form of the Magliarditi Trusts and Shell Company Defendants for illegitimate purposes and, as a result, adherence to the legal fiction of separate entity status for the Magliarditi Trusts and the Shell Company Defendants, or any of their subsidiaries, would sanction a fraud and promote an injustice.

108.    TransFirst respectfully requests that the Court enter a Judgment in its favor and find that Francine, the Magliarditi Trusts, and the Shell Company Defendants, each alone and in concert with one another, serve as the alter ego of Dominic and therefore their respective acts, transfers, and conveyances should be deemed to be the acts, transfers, and conveyances of Dominic, as if he had personally conducted those acts, transfers, and conveyances.

109.    TransFirst respectfully request that the Court award it a constructive trust over all property transferred by any alter ego of Dominic and award all other damages, including punitive damages, all costs, fees and all other relief the Court deems just under the circumstances against all of the Defendants.

## PRAYER FOR RELIEF

TransFirst prays for relief and judgment as follows:

- Awarding compensatory damages in favor of TransFirst against Defendants as a result of their wrongdoing in an amount to be determined by a trier of fact, including pre- and post-judgment interest thereon;

- Awarding appropriate restitution to TransFirst from any fraudulent transferee identified herein;

- Awarding TransFirst punitive and/or exemplary damages where such damages are available;

- Awarding TransFirst reasonable costs and expenses, including, among other things, the attorney fees that it will incur in this action, as well as the attorney fees that it has previously incurred in attempting to collect on the Judgment; and

- Temporarily and permanently enjoining Defendants, as previously described herein, for purpose of preserving the *status quo*, preserving whatever value of assets and property may

still be held by Defendants, and to otherwise prohibit Defendants from continuing to hide, transfer, or divert any of their assets, property, and income;

- Appoint a receiver to take charge over the assets, property, and entities that are the subject of the allegations set forth herein;

- Awarding TransFirst any and all other relief, whether at law or in equity, to which it is justly entitled.

Respectfully submitted,

**REESE GORDON MARKETOS LLP**

Pete D. Marketos
Texas Bar No. 24013101
pete.marketos@rgmfirm.com
Adam C. Sanderson
Texas Bar No. 24056264
adam.sanderson@rgmfirm.com

750 N. St. Paul Street, Suite 610
Dallas, Texas 75201
(214) 382-9810 Telephone
(214) 501-0731 Facsimile

**ATTORNEYS FOR JUDGMENT-CREDITORS
TRANSFIRST GROUP, INC. f/k/a
TRANSFIRST HOLDINGS, INC.,
TRANSFIRST THIRD PARTY SALES, LLC
f/k/a TRANSFIRST MERCHANT SERVICES,
INC., and PAYMENT RESOURCES
INTERNATIONAL, LLC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served

on all counsel of record on July 29, 2016 *via* E-Service.

Adam Sanderson